**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:09cr220-2** |
| | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **OUSMANE BARRY,** | : | |
| **Defendant** | : | |

**MEMORANDUM**

Before the court are Defendant Ousmane Barry's pre-trial motions.

Having been fully briefed and an evidentiary hearing held, the matters are ripe

for disposition.

**Background**

The United States swore out a criminal complaint against Defendants

Ousmane Barry and Ousmane Camara on July 9, 2009.  (Doc. 1).  The

complaint alleges that, on or about February 28, 2009, Defendants conspired

to use counterfeit access devices with the intent to defraud multiple financial

institutions in violation of 18 U.S.C. § 371.  Defendants made an initial

appearance on July 10, 2009.  (Docs. 10, 13).

On July 21, 2009, the grand jury handed down an indictment that named

Defendants Barry and Camara on five counts.  (Doc. 15).  Count 1 alleges a

conspiracy between the two Defendants to use counterfeit access devices

with intent to defraud.  Count 2 alleges that Defendants committed credit card fraud between September 2008 and February 2009 by using unauthorized credit cards to obtain merchandise and services valued at more than $1,000. Count 3 alleges that Defendants engaged in credit-card fraud by using unauthorized credit cards to obtain merchandise and services valued at more than $1,000 from December 2008 until February 2009.  Count 4 raises the same claim with respect to cards used between September 2008 and February 2009.  Defendants pled not guilty to these charges on July 30, 2010. (Docs. 20-21).

After filing numerous motions for extensions of time, Defendant Ousmane Barry (hereinafter "Defendant") eventually filed the instant pre-trial motions on January 21, 2011.  The government responded.  The court then held an evidentiary hearing on Defendant's motions on August 25, 2011, bringing the case to its present posture.  (See Tr. of Proceedings (Doc. 86)).

Officer Craig Santoro was the sole witness at this hearing.  (Id.)  Santoro testified that he was an officer with the Franklin Township Police Department in Hunterdon County, New Jersey.  (Id. at 3).  Santoro had served twelve years in Franklin Township and seven years before that as a county sheriff. (Id.)

Santoro was on duty at 8:00 a.m. on February 28, 2009. (Id. at 4). His duties that day included responding to calls, investigations, and "whatever arose during [his] shift." (Id.) Santoro was on patrol in a marked police car. (Id.) He was wearing a full police uniform. (Id. at 5). At that time, he received a dispatch. (Id. at 4). A call came over the police radio that "loss-prevention" at the local Wal-Mart had observed individuals in the store "attempting to purchase merchandise with what the security people believed to be either stolen or fraudulent credit cards." (Id.)

Santoro was seven or eight minutes away from the store when he heard this dispatch. (Id.) "[I]mmediately," he "got on the police radio and called an officer from the next town over to see if he was in proximity of the store." (Id.) The officer Santoro called was in proximity to the store, and "[t]wo officers from the next town over arrived at the store probably four to five minutes before [he] did." (Id. at 5).

Eventually, Santoro arrived at the Wal-Mart. (Id. at 5). Patrolman Tilstra and Patrolman Cohen from the Town of Clinton were already there. (Id.) When Santoro arrived, he saw the two Town of Clinton officers, "two potential suspects" and Wal-Mart's loss prevention supervisor walking out of the store's "big automatic doors" (Id.) The group of five people walked toward Santoro. (Id.)

3

Santoro got out of his car and spoke with Officer Tilstra and Wanda Mercado, supervisor of loss prevention.  (Id. at 6).  Tilstra and Mercado explained to Santoro that the two suspects had been observed in the Wal-Mart self-checkout line attempting to purchase merchandise.  (Id.)  The men used "several different cards" to do so.  (Id.)  That activity raised Wal-Mart security personnel's suspicion.  (Id.)

Santoro next spoke with the two detained men.  (Id. at 6-7).  He examined the merchandise they had, which included "several Nintendo games, DS games."  (Id. at 7).  The games were in Wal-Mart bags.  (Id. at 7).  Santoro asked to see the merchandise and the card used to purchase it.  (Id.)  The individual Santoro spoke to about the cards had opened his wallet and pulled out several cards, before eventually determining that he had used "a Visa all access card" to purchase the games.  (Id.)  Santoro eventually discovered that this man had "three or four" cards of the same type, "which were basically gift cards," either Visa or Mastercard.  (Id. at 8).

Santoro asked for identification from these men.  (Id.)  One man provided a hospital card and a library card.  (Id.)  The other individual had no identification, though he did have the Connecticut driver's license of another person.  (Id.)  Santoro noticed that these two men had unusual accents, which

4

Santoro thought was "a Jamaican type accent, and I don't know if they are Jamaican, but that type of accent." (Id. at 11-12).

Eventually, another police officer, Sergeant Derosa of the Clinton Township Police Department, arrived on the scene. (Id. at 9). Derosa called Santoro to his vehicle and asked him if he had identified the vehicle in which the two men had arrived at the Wal-Mart. (Id.) Derosa informed Santora that there were two individuals in a minivan parked about halfway through the lot. (Id. at 9-10). Derosa had arrived in the parking lot in a marked car wearing a full uniform. (Id. at 10). When the two persons in the minivan saw Derosa's car approach, they "slouched down in their seats almost like they were attempting to hide from him." (Id.) Santoro asked the two detained men how they arrived at the Wal-Mart. (Id.) In the end, the men admitted that they had arrived in the van identified by Sergeant Derosa. (Id. at 10-11). Santoro described the van as "bluish in color and it had Michigan registration plates." (Id. at 11).

Santoro and Patrolman Cohen then walked over to the minivan. (Id. at 12). The individuals in the van at first "basically ignored" them and "continued to look straight ahead." (Id.) Two men were in the car. (Id.) Santoro identified Defendant Ousmane Barry as the individual he saw sitting in the passenger seat of the van that day. (Id.)

Santoro walked around to the back of the van, "to identify all personnel in the vehicle or identify any potential hazards." (Id. at 13).  The officer "look[ed] in the back window of the van just to see if there was anything in there that would be some kind of a surprise or some kind of a danger to [him]." (Id.)  When he looked in the van as he was walking around, Santoro "noticed some boxes that appeared to be like laptop computers."  (Id.)  At the time, the officer could see "probably three or four laptop boxes."  (Id.)  They were stacked atop each other, and were not in shopping bags. (Id.)  Santoro then moved closer to the van and looked in the back window, which was tinted. (Id.)  He saw "several additional Wal-Mart bags."  (Id.)

When Santoro approached the driver, he looked through the window of the sliding door behind the driver.  (Id. at 13-14).  He could see "additional Wal-Mart bags," perhaps three or four of them.  (Id. at 14).  There was "some merchandise kind of hanging outside of the bags."  (Id.)  There were bags on the floor and on the back seat.  (Id. at 14).  Santoro noticed that the bags on the back seat "kind of had fallen over," and he could observe "a couple of Nintendo DS games."  (Id.)  These games were "similar to the ones that the individuals who [he] had spoken to earlier had in their possession."  (Id.)

Santoro then approached the driver of the car, Ousmane Camara.  (Id.) He asked the driver if he knew the two individuals the police had taken into

custody.  (Id.)  The driver did not give a "straight answer" at first, but eventually admitted to Santoro that the men were "with him."  (Id.)  Defendant Barry was seated next to the driver in the passenger's seat while this conversation took place.  (Id. at 15).

Santoro then asked Camara about the merchandise on the back seat and the computers he had seen through the rear window.  (Id.)  Camara claimed that "they had purchased them."  (Id.)  Santoro asked if he could see the computers in the back, and Camara agreed.  (Id.)  Not wanting to open the car himself, Santoro asked Camara to get out of the car and open the back door.  (Id.)  Camara got out of the car.  (Id.)  As they were speaking, Santoro noticed that Camara had "the same type of accent" as the men with whom he had previously spoken.  (Id.)

When Camara opened the front door of the van, Santoro, as was his practice, "[took] kind of a . . . cursory look very quickly to make sure there is nothing there [he] need[ed] to be aware of."  (Id. at 16).  Santoro did not see any "immediate threat or danger, but . . . did notice something very odd regarding the seatbelt housing," which he described as "[t]he plastic housing that you pull the seatbelt out of when you put your lap belt on, your seatbelt."  (Id.)  Santoro saw "what appeared to be additional credit cards down in the seatbelt housing."  (Id.)  Santoro had bent down to "look for a weapon,

7

anything that might be of a potential danger to [him]" and "look[ed] down to see if the door had a pocket, like if [he] could see there was a gun hidden in the pocket." (Id.)  As he did so, he "kind of looked under the seat and around the seat area, and [he] actually saw additional credit cards that were down in the seatbelt housing." (Id.)  Santoro saw "several" cards in this area. (Id.)  Santoro was suspicious upon viewing these cards because he had "never seen cards stored that way." (Id. at 20-21).  Santoro testified, "I carry my cards in my wallet, and I don't have a big, thick pile of them probably an inch and a half thick.  It did raise my suspicion." (Id. at 21).  The fact that the two other men previously interviewed had similar cards in their possession raised Santoro's suspicion further, especially since Santoro had concluded all four men were together. (Id.)

Camara then walked to the back of the van and opened the hatch for the officer. (Id. at 17).  Santoro observed four Hewlitt-Packard computers and one Dell computer. (Id.)  All were laptops, and "all [were] in their original boxes with stickers on and everything." (Id.)  Santoro then asked to see the contents of the Wal-Mart bags he saw in the seat behind the driver. (Id.)  Camara agreed and walked to the side door, opening it. (Id.)  Santoro observed Wal-Mart bags containing Nintendo games, as well as "green garbage-type bags that had clothing" inside them. (Id.)  He asked Camara, "what are you doing

8

will all of this stuff?" (Id.)  Camara replied with "something about Goodwill . . . or a goodwill mission, and they give it to their home country or something like that." (Id.)  As Camara was getting back in the car, Santoro "confronted" him about the cards he had seen stuffed in the seatbelt housing.  (Id. at 19).  Camara's reply was vague, merely confirming that "they are other cards or additional cards." (Id.)

After speaking with Camara and allowing him to sit back inside the vehicle, Santoro "went around to the passenger's side and eventually attempted to speak to" Defendant.  (Id.)  "[Defendant] didn't say a whole lot." (Id.)  Defendant merely "said he was friends with these guys, he knew them." (Id.)  He gave Santoro a New York driver's license.  (Id.)  Santoro ran a check to see if there were any outstanding warrants for either Camara or Defendant, and found none.  (Id. at 19-20).

Santoro then conferred with the other officers on the scene.  (Id. at 21).  The officers "concluded that this investigation absolutely needed to be furthered, that there was definitely some type of activity here with the potential of criminal activity." (Id.)  The two officers from Clinton put the men stopped outside the store in custody, and Santoro took Camara and Defendant into custody.  (Id.)

Santoro asked Defendant to step out of the van.  (Id. at 22).  He made a quick check "to make sure there were no weapons or anything that [he] needed to be aware of."  (Id.)  Because of the cards he had observed on the driver's side of the car, Santoro "look[ed] right down toward the seatbelt housing."  (Id.)  He saw "additional cards" on Defendant's side of the car as well.  (Id.)  The cards were not "neatly packed," but instead "stuffed down in." (Id. at 23).  Santoro saw "an inch to an inch and a half thick worth of cards." (Id.)

In describing how he had seen the items taken from the van, Santoro agreed that when he looked inside the van "for [his] own safety and protection," he had a "clear view" of the items in the vehicle: "I did not have to disturb anything to get a view, and I did not have to disturb anything to see the additional Nintendo DS games that had fallen out on the seat."  (Id. at 23-24). Similarly, when Camara agreed to exit the car, Santoro "just briefly looked around to see there was no weapon there, and [he] could see down in the seatbelt."  (Id. at 24).  Santoro was "standing at the door."  (Id.)  When Camara opened the door, "[Camara] was literally like two to three feet away from [Santoro]."  (Id.)  Santoro stood "close enough where if anything happened, [he] could get ahold of [Camara] to protect [himself]."  (Id.)  From this position, Santoro "was almost looking straight down into the seatbelt

10

housing, and that is how [he] could see right down in it, but [he] did not have to disturb anything." (Id.)  Santoro also testified that he took that "cursory" look inside the vehicle because he had been trained to do so, but also because "roughly sixteen and a half years of experience leads you to do something like that." (Id. at 25).

**Discussion**

Defendant has filed four motions before the court – a motion to suppress evidence, a motion to disclose Jencks material, a motion to dismiss Counts 2, 3, and 4 of the indictment as multiplicitous, and a motion seeking a bill of particulars.  The court will address each of Defendant's motions in turn.

**A.  Motion to Suppress Evidence**

Defendant seeks to suppress any physical evidence seized from Defendant or the vehicle in which he was a passenger on February 28, 2009 and statements he made that day.  He contends that his arrest was unlawful and any evidence gathered after that arrest should be suppressed.

"The Fourth Amendment guarantees: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"

Minnesota v. Carter, 525 U.S. 83, 88 (1998).  Defendant argues that he was arrested in violation of the Fourth Amendment, as he was taken into custody without a warrant and without probable cause.

It is uncontested that the police did not have a warrant for Defendant's arrest when they took him into custody.  Courts have determined, however, that "'[l]aw enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony.'" United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (quoting United States v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992)).  Courts have concluded that "[i]n assessing the presence of probable cause, a court must determine the fact pattern the officer encountered and, in light of that, whether the arresting officer had 'probable cause to believe that a criminal offense has been or is being committed.'"  Snell v. City of York, 564 F.3d 659, 671 (3d Cir. 2009) (quoting Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997)).  The question for the court is "'whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" Id. (quoting U.S. v. Burton, 288 F.3d 91, 98 (3d Cir. 2002)).  "'Mere suspicion,' however, is insufficient."  Id.

This case involves an apparent investigatory stop.  "When a police officer has a 'reasonable, articulable suspicion that criminal activity is afoot,' he or she may conduct a 'brief, investigatory stop.'" United States v. Whitfield, 634 F.3d 741, 744 (3d Cir. 2010) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).  Such "'[r]easonable suspicion' requires less than probable cause, but there must be 'at least a minimal level of objective justification for making the stop.'"  Id.  A court examines "the totality of the circumstances" in assessing whether reasonable suspicion exists.  Id.  While a reasonable suspicion can exist without the suspect having engaged in any obviously illegal behavior, "[t]he circumstances, however, 'must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.'" Id. (quoting United States v. Cortez, 449 U.S. 411, 418 (1981).  "Reasonable suspicion 'must be based on common sense judgments and inferences about human behavior.'" Id. (quoting Wardlow, 528 U.S. at 125).

Still, even if reasonable suspicion justifies such a stop, the stop "may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." United States v. Johnson, 592 F.3d 442, 451 (3d Cir. 2010).  In determining whether the execution of the stop was invalid, courts ask whether "the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the

interference in the first place.'"  Id. at 452 (quoting Terry v. Ohio, 392 U.S. 1, 19-20 (1968)).  During such stops, "a police officer conducting an investigative stop has an 'immediate interest . . . in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.'"  Id. (quoting Terry, 391 U.S. at 23).

The court concludes that police had a reasonable suspicion of criminal activity sufficient to make an investigatory stop.  As explained above, by the time the police approached the van in which they discovered Defendant, they had detained two men on suspicion of theft from the Wal-Mart.  These men possessed a number of access cards and electronic game cartridges.  Neither man had produced a valid driver's license, and the only identification one could provide was a driver's license that belonged to another person.  The two detained men admitted to Santoro that they arrived at the Wal-Mart in a van, and pointed out the vehicle to officers.  When Sergeant Derosa passed the van, the occupants – including Defendant – had slouched in their seats. When Santoro approached, the van's occupants avoided eye contact.  Such behavior created a reasonable suspicion of wrongdoing, and an investigatory stop was warranted.  Moreover, the stop was not unreasonably intrusive. Santoro did not issue any orders, and did not immediately tear about the car in

an attempt to find evidence.  He merely observed, and those observations were limited to items in plain sight and attempts to make sure that no dangerous items were within easy reach of the men he had stopped.

During this investigatory stop, Santoro observed a number of items in plain sight in the car that connected the men in the car to the apparently illegal activities of the other two men.  He saw in plain view in the back seat of the car a number of Nintendo cartridges similar to those found on the men who entered the store.  He also saw an unusual number of boxed laptop computers in the rear compartment of the van.  These observation do not implicate the Fourth Amendment, given the valid investigatory stop that preceded it.  See Horton v. California, 496 U.S. 128, 134 n.5 (1990) (finding that "an officer's mere observation of an item left in plain view" does not implicate the Fourth Amendment).  Moreover, when he asked Camara to exit the vehicle, Santoro made a quick check for weapons and noticed an unusual number of what appeared to be access cards, similar to those the other men were suspected of using, jammed up against the seat-belt housing.  When Defendant agreed to exit the vehicle, Santoro made a similar observation. After making these observations, Santoro took Defendant into custody. Santoro therefore arrested Defendant without a warrant, and must rely upon a finding of probable cause to justify this arrest.

The court finds that under the totality of the circumstances Officer Santoro had probable cause to arrest Defendant. Given Officer Santoro's knowledge of the alleged criminal activity of the men in the store, the admission by those men that they had arrived at the Wal-Mart in the van in which Defendant was sitting, the similarity of the items in the vehicle that were in plain view to the items that the men who went into the store possessed, and the access cards that appeared to have been hastily shoved into the seat belt housing next to where Defendant was sitting, a reasonably prudent person could conclude that criminal activity had or was occurring. Probable cause existed for the arrest, and the court will not suppress evidence seized incident to that lawful arrest. The motion will be denied on this point.

At the scene, defendant admitted he knew the men detained outside of the store. Defendant seeks suppression of his statement to the police. The Supreme Court has held that the Self-Incrimination Clause of the Fifth Amendment "[bars] the introduction in federal cases of involuntary confessions made in response to custodial interrogation." Withrow v. Williams, 507 U.S. 680, 688 (1993). Courts have established that "a statement is involuntary when the suspect's 'will was overborne in such a way as to render his confession the product of coercion.'" Choi Chi Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002) (quoting Arizona v. Fulminante, 499 U.S. 279, 288 (1991)).

"[C]ustodial interrogation" is "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Oregon v. Mathiason, 429 U.S. 492, 494 (1977) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  There is no dispute here that Defendant was not advised of his rights before he made his statement.  At issue, however, is whether Defendant was actually in custody when he spoke with police.

A person is in custody, despite not being formally arrested, when something is said or done by the "'authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006) (quoting Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974)).  Though the Third Circuit Court of Appeals has held that normally "the principles of Miranda have been held not to apply to the traffic stop context"  United States v. Anderson, 859 F.2d 1171, 1177 (3d Cir. 1988), the Supreme Court has found that "[i]f a motorist [who] has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Berkemer v. McCarthy, 468 US. 420, 440 (1984); see also, United States v.

<u>Elias</u>, 832 F.2d 24, 26-27 (3d Cir. 1987).  The court must therefore inquire into "how a reasonable man in the suspect's position would have understood his situation" to determine whether the traffic stop constituted a routine stop or at some point transformed into a situation where the defendant was "in custody" for <u>Miranda</u> purposes.  <u>Berkemer</u>, 468 U.S. at 441.  "[T]he safeguards prescribed by <u>Miranda</u> become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" <u>Id.</u> at 440 (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)).

The statement here in question is Barry's admission that he knew the men who had been detained in front of the Wal-Mart.  He made this statement during his initial conversation with Santoro, while still seated inside the van. The questioning and the statement came before Santoro asked Defendant to step outside the van and before Santoro took Camara into custody.  The court concludes that the conversation came before Santoro's investigatory stop was transformed into a formal arrest.  No evidence indicates that Santoro told Barry he could not leave.  No guns had been drawn, nor had police approached the car with an urgency that would have led a reasonable person to conclude that he could not simply leave.   As such, there are no grounds to suppress the statement, and the court will deny Defendant's motion on these grounds as well.

18

## B. Motion to Disclose Jencks Material

Defendant seeks early disclosure of material available to him through the Jencks Act, 18 U.S.C. § 3500.  Though Defendant acknowledges that he is not entitled to the material in question until after a witness testifies, he seeks to have the material produced fourteen days before the scheduled trial date.

The Jencks Act provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."  18 U.S.C. § 3500(b).  Federal Rule of Criminal Procedure 26.2(a) likewise provides that "[a]fter a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony."  FED. R. CRIM. P. 26.2(a).  Courts have concluded that the statute requires disclosure of prior statements related to the subject of a witness's testimony "after each witness testifies on direct examination."  United States v. Weaver, 267 F.3d 231, 245 (3d Cir. 2001).  Disclosure of such statements "is

mandatory if the defendant makes a timely motion." United States v. Hill, 976 F.2d 132, 140 (3d Cir. 1992). Thus, the government is required to provide Defendant Barry, who has filed a timely motion, any statements that qualify under the Act.

Such disclosure, however, is not required until after those witnesses testify. See United States v. Merlino, 349 F.3d 144, 155 (3d Cir. 2003) (Jencks Act "disclosures must be made *after* each witness testifies on direct examination.") (emphasis added). District courts do not have the discretion to compel the early disclosure of Jencks material. See United States v. Murphy, 569 F.2d 771, 773 (3d Cir.), cert. denied 435 U.S. 995 (1978); see also United States v. Moyer, 726 F. Supp. 2d 468, 513-14 (M.D. Pa. 2010) (finding that "[i]t is not within the power of the District Court to accelerate" the Jencks material disclosure timetable) (citing United States v. D'Elia, No. 3:cr-06-191, 2007 U.S. Dist. LEXIS 62658, 2007 WL2458487, at *7 (M.D. Pa. 2007)). In the instant matter, the government notes this requirement and does not propose to disclose the material earlier than the deadline mandated under the law.

Accordingly, the court will deny Defendant's request for the early disclose of Jencks material. However, the court strongly encourages the government to provide Defendant with all materials covered by the Jencks Act

by 5 p.m. on the Friday before the trial is scheduled to begin.  Early disclosure of the Jencks material by the government will promote efficient examination of witnesses and avoid delays at trial.

### C.  Motion to Dismiss Counts 2, 3, and 4 as Multiplicitous

Defendant argues that Counts 2, 3 and 4 of the indictment should be dismissed as multiplicitous.  The conduct charged in those counts is duplicative of the conduct charged in Count 1, which could lead to confusion for the jury or multiple convictions under the same statute for the same conduct.

"Multiplicity is the charging of the same offense in two or more counts of an indictment or information."  United States v. Stanfa, 685 F.2d 85, 86-87 (3d Cir. 1982).  Such an indictment could "lead to multiple sentences for a single violation, a result prohibited by the Double Jeopardy Clause."  United States v. Pollen, 978 F.2d. 78, 83 (3d Cir. 1992).  Multiplicity also "has the vice that it may lead to multiple sentences for a single violation . . . [and] may prejudice the jury against the defendant by creating the impression of more criminal activity on his part than in fact may have been present."  United States v. Carter, 576 F.2d 1061, 1064 (3d Cir. 1978).  To determine "whether counts of an indictment are truly separate, and not multiplicious," courts ask "whether proof of one offense charged requires an additional fact that proof of the other

offense does not necessitate." Id.   Additionally, courts ask "whether the legislature intended to make separately punishable the different types of conduct referred to in the various counts." Id.

The indictment in this case charges Defendant with three counts of credit card fraud.  Count 2 alleges that "[o]n or about September 2008 and continuing to February 2009, in the Middle District of Pennsylvania" Defendants "knowingly and with intent to defraud, used one or more unauthorized access devises (credit cards), during a one year period, to obtain merchandise and services valued in excess of $1,000.00."  (Doc. 15). Count 3 also charges credit card fraud, occurring from "December 2008 to February 2009, in the Middle District of Pennsylvania," and it alleges that Defendants "knowingly and with intend to defraud, used one or more unauthorized access devices (credit cards), during a one year period, to obtain merchandise and services valued in excess of $1,000.00."  (Doc. 15). Count 4 is identical to Count 2.  (Doc. 15).

The government responds by stating that "Counts 2 through 4 of the Indictment all charge Barry with different offenses committed with different individuals.  Each requires proof that none of the other Counts require."  (Doc. 71 at 3).  The government's brief relates that Count 2 will be supported from testimony from two men arrested at the same time as Defendant.  These men

will testify that they worked with Defendant to use false credit cards to

purchase merchandise at various retail stores in Pennsylvania.   Count 3

relies on the testimony of another man, who will describe a series of similar

purchases at Wal-Mart stores in Pennsylvania.  Count 4 relies on the

testimony of a fourth individual, who will describe another set of trips to use

counterfeit credit cards with Defendant.

The court finds that the indictment, despite this additional information

provided by the government, creates a real danger that Defendant could be

convicted more than once for the same conduct.  The court accepts, however,

the government's representation that each count of the indictment relies on

different and distinct acts.  In order to preserve the defendants' rights,

however, the court will require that the jury verdict and jury instructions make

clear that each count relies on distinct conduct involving separate people and

separate occasions.  As explained below, the court will also grant Defendant's

motion for a bill of particulars as a means of insuring that Defendant does not

face double jeopardy.  Without such information, the present indictment does

not allow Defendant an adequate opportunity to prepare a defense and

presents a danger of multiple convictions for the same conduct.  The motion is

denied without prejudice to Defendant raising the issue again at an

appropriate time if the government fails to provide separate evidence for each count.

### D.  Bill of Particulars

Defendant also seeks a bill of particulars from the government.  "The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense."  United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971) (quoting United States v. Tucker, 262 F. Supp. 305, 308 (S.D.N.Y. 1966).  Federal Rule of Criminal Procedure 7(f) allows a court to direct the filing of a bill of particulars.  In determining whether to grant a bill of particulars, a trial court must strike a "prudent balance" between the defendant's interests in securing information and the government's interests in not committing itself to facts before it is in a position to do so.  United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989).  "A bill of particulars is not intended to give the defendant the fruit of the government's investigation, but is instead intended to provide the defendant with the minimum amount of information necessary to permit the defendant to conduct his own defense."  United States v. Serafini, 7 F. Supp. 2d 529, 547 (M.D. Pa. 1998) (citing United States v. Smith, 776 F.2d 1104 (3d Cir. 1985).  "In ascertaining whether a bill of

24

particulars is appropriate, the Court may consider not only the indictment, but also all the information which has been made available to the defendants." United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384, 1389 (W.D. Pa. 1989) (citing United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir.), cert denied, 409 U.S. 914 (1972); United States v. Bloom, 78 F.R.D. 591, 600-601 (E.D. Pa. 1977); United States v. Azzarelli Constr. Co., 459 F. Supp. 146, 151 (E.D. Ill. 1978), aff'd, 612 F.2d 292 (7th Cir. 1979), cert. denied, 447 U.S. 920 (1980); United States v. Barrows, 122 F. Supp. 324, 325 (D. Del. 1954)).

As explained above, the indictment is inadequate to allow Defendant to understand the nature of the charges against him, specifying illegal conduct in only the most general way.  Indeed, two of the counts are identically worded and equally vague.  The court will grant this motion in part as it relates to Counts 2, 3 and 4 of the indictment.  From the government's representations, it appears that each charge is related to the testimony of individuals who claim Defendants Barry and Camara brought them to retail outlets where they used counterfeit credit cards to obtain goods.  The government is ordered to provide Defendant with the names of the individuals who claim they participated in these schemes with Defendants Barry and Camara.  The government is also ordered to provide Defendant with a general description of the time period and places where these individuals allegedly carried out these

schemes.  Such information will be sufficient to inform Defendant of the nature of the charges against him and the bases on which the government makes them.  Defendant will be able to differentiate the charges in the indictment. The order is also limited, and does not require the government to turn over its entire investigatory file.

**Conclusion**

For the reasons stated above, Defendant's pre-trial motions will be granted in part and denied in part.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:09cr220-2** |
| | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **OUSMANE BARRY,** | : | |
| **Defendant** | : | |

**ORDER**

**AND NOW**, to wit, this 12th day of September 2011, Defendant

Ousmane Barry's pre-trial motions are hereby **GRANTED** in part and **DENIED**

in part, as follows:

1.  Defendant's motion to suppress evidence and statements (Doc. 63)

is hereby **DENIED**;

2.  Defendant's motion for disclosure of Jencks material (Doc. 64) is

hereby **DENIED**.  The government is encouraged to provide Defendant

with all materials covered by the Jencks Act by 5 p.m. on the Friday

before the trial;

3.  Defendant's motion to dismiss Counts 2, 3, and 4 of the indictment as

multiplicitious (Doc. 66) is hereby **DENIED**.  The government shall,

however, craft the verdict forms in this case to reflect the differences

between the counts alleged in the indictment;

4.  Defendant's motion for a bill of particulars (Doc. 68) is hereby

**GRANTED**.  The government shall provide Defendant with the names of

the individuals who claim they participated in these schemes with

Defendants and a general description of the time period and places

where they carried out these schemes.




**BY THE COURT:**

_ **s/ James M. Munley** _____
**JUDGE JAMES M. MUNLEY**
**United States District Court**